# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

REBECCA I. HARP,
        Plaintiff,

  v.                                                         Case No. 18-C-1039

ALLISON GLOCK,
        Defendant.

---

REBECCA I. HARP,
        Plaintiff,

  v.                                                         Case No. 18-C-1159

NBCUNIVERSAL,
        Defendant.

---

## DECISION AND ORDER

On September 1, 2016, the Investigation Discovery channel aired an episode of the true-crime series *Unraveled* entitled "Never Say Goodbye." The episode, which was produced by NBCUniversal Media, LLC, focuses on a thirteen-year relationship between two high-school and collegiate women's basketball players, Malika Willoughby and Rosalind "Roz" Ross. In 2011, Ms. Willoughby pleaded guilty to a homicide charge that arose out of her shooting Ms. Ross a year earlier. These events were the subject of an article authored by Allison Glock and published in *ESPN The Magazine* in 2012. Ms. Glock appears in the episode and offers commentary and opinions.

On July 9, 2018 and July 27, 2018, Rebecca Harp—Ms. Willoughby's mother—filed separate civil actions in this court against Ms. Glock and NBCUniversal. In each action, Ms. Harp, who is pro se, alleges that the episode contains defamatory

statements and depictions about her relationship with her daughter and her daughter's childhood. These actions were consolidated. Before consolidation, each defendant filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). Later, Ms. Harp filed a motion to amend her complaint against NBCUniversal only. NBCUniversal does not oppose the motion to amend, but it states that if the court grants leave to amend it will file a motion to dismiss the amended complaint. Ms. Harp has also filed a motion for summary judgment against Ms. Glock.

As explained below, the episode itself, which is properly considered part of the plaintiff's complaint against each defendant, provides enough factual matter about Ms. Harp's claims to resolve each defendant's motion to dismiss. Moreover, Ms. Harp's proposed amended complaint, even if filed, would not change the result of the motions to dismiss or alter the course of future litigation. For these reasons, I will address each defendant's motion to dismiss in this order and deny Ms. Harp's motion for leave to file the amended complaint. I also deny the plaintiff's motion for summary judgment because it relies on defendant Allison Glock's failure to respond to requests for admissions that Ms. Harp served on her before the parties conferred under Federal Rule of Civil Procedure 26(f). Because the requests for admission were prematurely served, *see* Fed. R. Civ. P. 26(d)(1), Ms. Glock is not deemed to have admitted anything by failing to respond.

**I. The Episode Is Part of the Complaint**

When deciding a motion to dismiss under Rule 12(b)(6), a court usually cannot consider materials outside the plaintiff's complaint unless the court treats the motion as one for summary judgment. *See* Fed. R. Civ. P. 12(d); *Reed v. Palmer*, 906 F.3d 540,

549 (7th Cir. 2018); *Santana v. Cook County Bd. of Review*, 679 F.3d 614, 619 (7th Cir. 2012). However, the court may, without treating the motion as one for summary judgment, consider materials outside the complaint when they are mentioned in the complaint, concededly authentic, and central to the plaintiff's claim. *See, e.g., Hecker v. Deere & Co.*, 556 F.3d 575, 582 (7th Cir. 2009).

In the present case, the episode containing the allegedly defamatory statements meets these conditions. The plaintiff refers to it in her complaints, and because the episode contains the allegedly defamatory statements, it is central to her claims. Moreover, I do not understand the plaintiff to dispute the authenticity of the copy of the episode that NBCUniversal filed on DVD with its motion to dismiss. *See* Case No. 18-C-1159 ECF No. 17-2. Although the plaintiff previously stated that the DVD she received from NBC's counsel "has nothing on it," ECF No. 22 at 9, counsel later provided her with a second copy, ECF No. 23-1. Since receiving the second copy of the DVD, the plaintiff has not disputed its authenticity. Accordingly, in deciding the motions to dismiss, I will consider the episode as it appears on the DVD. Moreover, to the extent the complaint's allegations contradict or mischaracterize the contents of the episode, I will disregard them. *See Forrest v. Universal Sav. Bank, F.A.*, 507 F.3d 540, 542 (7th Cir. 2007) (on a motion to dismiss, the court "is not bound by the party's characterization of an exhibit and may independently examine and form its own opinions about the document").

## II. The Allegedly Defamatory Content

### A. The Episode

The episode is approximately 45 minutes long. After a brief introduction, the episode depicts, though dramatic reenactments and narration, the circumstances under

3

which Roz and Malika met each other.[1] The skyline of downtown Milwaukee is shown, followed by a shot of a playground in what appears to be a residential neighborhood in the city. The camera moves to an indoor basketball court. While a reenactment is depicted, the narrator explains that Roz and Malika met at a local basketball summer league in the summer of 1997. At that time, Roz was seventeen years old and Malika was fourteen. The narrator explains that both girls were excellent basketball players and became friends after impressing each other on the basketball court.

The reenactment shows Roz and Malika spending time together, and the narrator explains that Malika began to hang out, regularly, at Roz's house. As the reenactment shows Malika having dinner with Roz's family, the narrator states, "Looking around the table, Malika sees a family dynamic very different from her own. She lives in a tough neighborhood a few miles from Roz with her mother, who works as a bus driver, and two younger sisters, one who has cerebral palsy." When the narrator says the words "tough neighborhood," images of what appears to be a residential neighborhood in the City of Milwaukee are shown.

At this point, Allison Glock is shown in a studio. She states, "Malika's home life was really challenging. She had a disabled sister whom she was, ah, largely responsible for, and she was under extreme stress and duress from a very early age." The episode returns to the reenactment, where actresses portray Malika and her mother.[2] The actress playing Malika's mother asks Malika to help with her sister. The

---

[1] The episode refers to Ms. Ross and Ms. Willoughby by their first names. I will follow this practice when describing the contents of the episode.

[2] Ms. Harp is never identified by name in the episode, and her actual likeness is never shown. However, the defendants do not dispute that viewers who know Ms. Harp would

actress playing Malika responds, "Okay Mom, I'll be right there." We then see Pamela Collins, Roz's mother, in the studio. She states, "I think Malika did have to grow up fast because she had to take care of her sisters." Roz's father, Willie Edward Collins, is also shown in the studio. He states, "One time Malika did mention something to me that she really didn't have a life for herself, you know, mother always had her watching other kids." Spencer Ross, Roz's brother, appears next. He states, "I know that Malika took on a lot of adult responsibilities as far as making sure her younger sister was okay and taking care of her, um, disabled sister. It was a lot on Malika's plate." While the Ross family speaks, the actress playing Malika is shown sitting in her home, looking lonely.

The episode returns to the reenactment. It shows the actress portraying Harp coming home from work. As soon as she sits down, Malika excitedly runs to her. She says, "Hey Mom, I waited for you to get home so I could tell you about this awesome play I did." Before Malika finishes, her mother interrupts, "Not now, honey, I just got home, I'm tired, and I have to find your sister's medication." As her mother says these words, Malika's smile fades. She says "Okay. Maybe later." The actor portraying Ms. Harp wonders whether she left Malika's sister's medication in the kitchen. After she gets up to look, the camera lingers on Malika's face for several seconds to show her disappointment. After this scene, the reenactment shows Malika and Roz having fun together. The narrator states, "With Roz, Malika can forget her burdens, and she feels at home in a way she never has before."

In the scenes that follow, the reenactment shows Malika and Roz becoming closer. Spencer Ross states that it was almost like the two of them "shut everyone else

---

understand the portions of the episode depicting or referring to Malika's mother as referring to her.

out." The episode returns to Ms. Glock, who states "For Malika, Roz was a safe shore and I think the person who really loved her, or at least that she felt loved by." The reenactment shows the girls holding hands. The narrator states, "Then, one day in late summer, their relationship takes a tentative step in a more intimate direction." The reenactment shows Roz giving Malika a ring, and Malika kissing Roz. Then we see Glock in the studio, who says "I feel like it genuinely was, um, a love that sprung up organically from their relationship, and I, I wouldn't say one knew before another."

The episode depicts and explains how the girls' families disapproved of their romantic relationship. A psychotherapist is shown in the studio; she explains some of the challenges that gay and lesbian teenagers face. The reenactment shows Roz's father learning that the girls were in love and ordering Roz to stop seeing Malika. The reenactment then turns to Malika and her mother in their home. Malika is shown on the couch when her mother asks what she's doing and sits down next to her. Malika tells her mother she's doing homework. Her mother says, "Let's see," and looks in one of Malika's notebooks. She discovers a Polaroid picture of Roz and Malika kissing. Malika's mother confronts Malika about the picture, and Malika describes it as "nothing," saying that the girls were just "kidding around." Malika's mother is upset, and Malika says it won't happen again. Malika's mother replies, "It better not." Malika says she's sorry, and her mother gets up from the couch in anger. We then see Patricia Collins in the studio, who states, "'Cuz her mother didn't accept it. You know, she didn't accept her being gay. She didn't want her daughter—she didn't want a gay daughter." The episode continues to show Roz's conflict with her father and then explains that the adversity the girls faced caused their bond to strengthen.

Next, the episode shows Malika's love for Roz beginning to veer into unhealthy territory. Allison Glock states, "I think that initially, Malika felt like she'd, you know, won a lottery or something to be on the arm of Roz and to bask in the sort of attention that Roz would commonly get. But as their relationship progressed, it became a source of jealousy, um, and insecurity for Malika." The episode shows that, in the fall, Roz left Milwaukee to attend college in Oklahoma on a basketball scholarship while Malika finished high school. The narrator states, "It's the first time the girls have been separated, and Malika is miserable." The reenactment shows Malika sitting at home when her mother enters the room. Her mother states, "C'mon, you're moping around all the time now. It's because of that Roz girl, isn't it? I told you she wasn't good for you in the first place." After Malika replies, "Mom, she was fine," her mother tells her to come help with dinner, and Malika complies. We then hear Ms. Glock, "I think it was really challenging for Malika to be without Roz because Roz showed her affection and love and validated her—she felt fairly unmoored."

After this point, the episode does not depict or otherwise refer to Ms. Harp. It instead focuses on Malika's increasing jealousy and desire to have Roz to herself. It also shows Roz backing off from the relationship after becoming exasperated by Malika's jealousy and need for attention. Allison Glock states, "The sunlight of Roz went away; she felt left behind and I think, um, neglected." After a scene in which Roz tells Malika over the phone that it was time for a break in their relationship, Ms. Glock states, "I believe Malika probably was already prone to obsessiveness and jealousy, and when you marry that with love and then a partner who starts to pull away, it becomes a really combustible situation."

7

The episode explains that both girls went on to have successful college basketball careers. Roz was drafted by the WNBA, but an injury ended her career before she played a single pro game. Malika played college basketball at Kent State. After college, both women returned to Milwaukee and got a house together. Malika worked as a bank teller, while Roz coached basketball and worked as a security guard. Malika's obsessiveness, insecurity, and jealousy continued. The episode shows Malika beginning to drink alcohol, and Roz's family members, in the studio, explain that they were concerned about the amount she drank. Ms. Glock states that Malika grew increasingly possessive and erratic.

Eventually, Roz decides to leave Malika to take a job at her alma mater in Oklahoma. The episode explains that Roz is reluctant to tell Malika about her decision. However, one night, Roz and Malika drive to a fast-food restaurant for dinner. Before they leave, Malika takes a handgun that she and Roz had purchased for self-defense. The reenactment shows Malika and Roz arguing in their car after Roz receives a call and refuses to tell Malika who it is. During the argument, Malika accuses Roz of cheating on her, and Roz yells, "This is why I'm leaving you." Roz tells Malika that she's going to Oklahoma and not taking her with. At this point, the reenactment is interspersed with actual security footage from the drive-through lane. It shows the women arguing in the car and then Malika getting out of the passenger side, walking to the driver's side window, and shooting Roz. The footage from the drive-through lane and the reenactment show Malika cradling Roz's body on the pavement. The narrator explains that Roz was shot in the head and killed, and that, in August 2011, Malika pleaded guilty to first-degree reckless homicide and use of a deadly weapon. She

received a 13-year sentence. After a few concluding remarks by Ms. Glock and Roz's family members, the episode ends.

**B. Plaintiff's Claims**

The plaintiff alleges that the episode defames her by falsely depicting Malika's home life as a teenager in several ways. First, the plaintiff alleges that the episode falsely depicts that she and Malika lived in a "tough neighborhood." Second, she alleges that the episode falsely states that Malika was "largely responsible" for her disabled sister and that, because of this, her "home life was really challenging," resulting in "extreme stress and duress from a very early age." The plaintiff alleges that, in fact, Malika's sister was cared for by an in-home health aide five days a week until she entered foster care in 1998. Compls. ¶¶ 27–28. Third, the plaintiff alleges that the episode falsely implies that Malika was 14 years old and living at home with her mother at the time of the shooting. *See* Compls. ¶¶ 15, 22. Finally, the plaintiff alleges that the episode defames Malika by not providing enough information about the shooting, which the plaintiff believes was accidental. Compls. ¶¶ 36–42.

In addition to alleging claims for defamation, the plaintiff alleges claims for intentional infliction of emotional distress and fraudulent misrepresentation against NBCUniversal and Ms. Glock. She also alleges a claim for unjust enrichment against Ms. Glock. These claims are based on the same facts as the defamation claim.

### III. Discussion

To survive a Rule 12(b)(6) motion, a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

9

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint must, at a minimum, "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555.

**A. Defamation**

The parties agree that Wisconsin substantive law applies to this case. Under that law, a defamation claim has three elements: (1) a false statement, (2) communicated by speech, conduct, or in writing to a person other than the one defamed, and (3) the communication is unprivileged and tends to harm one's reputation, lowering him or her in the estimation of the community or deterring third persons from associating or dealing with him or her. *Torgerson v. Journal/Sentinel, Inc.*, 210 Wis. 2d 524, 534 (1997). Only the first and third elements are at issue in this case. Moreover, in their motions to dismiss, the defendants do not assert a privilege. Thus, the questions presented are (1) whether the plaintiff has adequately identified false statements, and, if so, (2) whether the allegedly false statements could reasonably be thought to either lower the plaintiff in the estimation of the community or to deter third persons from associating or dealing with her. The second question can be restated as asking whether the defendants' statements are "capable of defamatory meaning." Under Wisconsin law, this is a question of law that the court may resolve on a motion to dismiss, provided that the complaint sets forth the allegedly defamatory communication in its full context. *See Starobin v. Northridge Lakes Dev. Co.*, 94 Wis. 2d 1, 10 (1980); *Dilworth v. Dudley*, 75 F.3d 307, 309 (7th Cir. 1996). If the statement is capable of both a defamatory meaning

and a non-defamatory meaning, then the jury must decide whether the statement is defamatory. *Starobin*, 94 Wis. 2d at 10.

The defendants initially contend that the complaints do not comply with Federal Rule of Civil Procedure 8(a) because they do not provide notice of the specific statements alleged to be false and defamatory. However, although the plaintiff's complaints are not perfectly drafted, they provide the defendants with reasonable notice of the statements at issue. I identified the allegedly defamatory statements in Part II of this opinion. Construing the complaints liberally, as I must when the pleader is pro se, *see, e.g., Otis v. Demarasse*, 886 F.3d 639, 644 (7th Cir. 2018), I find that the plaintiff's allegations provide adequate notice of her claims.

Next, the defendants contend that the statements at issue are not capable of defamatory meaning or are not actionable for other reasons. As to some of the statements, I agree. First, the episode's describing Ms. Harp as living in a "tough neighborhood" is not capable of defamatory meaning. It is simply not the kind of statement that would cause a viewer to hold a person is less esteem.[3] Second, Ms. Harp cannot base a defamation claim on her belief that the episode implies that Malika was 14 years old and living at home with her mother at the time of her crime. The episode makes clear that the shooting did not occur until after Malika and Roz had graduated college and had been living together for some time. Thus, the episode does

---

[3] I also note that the episode contradicts the plaintiff's claim that the episode "stated and showed that the family lived in the rough neighborhood of Harambee that is infested with dilapidated, boarded-up homes." Compls. ¶ 15. The episode never states that the family lived in Harambee, and the footage of the residential neighborhood does not show that it was "infested with dilapidated, boarded-up homes." The depicted neighborhood is not glamorous, to be sure, but it is not the kind of scene that normally comes to mind when one thinks of a "rough neighborhood."

11

not contain this allegedly defamatory content. *See Forrest*, 507 F.3d at 542 ("A court is not bound by the party's characterization of an exhibit and may independently examine and form its own opinions about the document."). Finally, to the extent Ms. Harp alleges that the episode defamed Malika—such as by omitting details suggesting that the shooting was accidental—she does not state a claim, for a person may not base a defamation claim on statements that defame someone else. *See* 1 Rodney A. Smolla, *Law of Defamation*. § 4:74 (2d ed. 2018 update) ("there can be no vicarious defamation, or defamation through guilt by association").

With respect to the remaining statements, I find that they are capable of defamatory meaning. The crux of Ms. Harp's claim is that the episode falsely asserts that she required Malika to provide most of the care for her disabled sister and thus deprived her of a normal childhood. This assertion begins with Ms. Glock's statement: "Malika's home life was really challenging. She had a disabled sister whom she was, ah, largely responsible for, and she was under extreme stress and duress from a very early age." Glock's statement is reinforced by statements from the Ross family, which appear in the episode immediately after Glock finishes her statement. Roz's mother states that she thinks that Malika had to "grow up fast because she had to take care of her sisters." Roz's father adds that Malika did not have a life of her own because her "mother always had her watching other kids." Finally, Roz's brother states that Malika "took on a lot of adult responsibilities as far as making sure her younger sister was okay and taking care of her, um, disabled sister."

The defendants contend that these statements are not capable of defamatory meaning because they simply attribute to Ms. Harp a parenting decision that others

would consider reasonable in the context of a single-parent family with a disabled child. However, I understand Ms. Harp to be alleging that this was not a parenting decision she actually made. Instead, she worked hard to prevent Malika from having to bear the bulk of the responsibility for her disabled sister, including by arranging for an in-home health aide five days a week from 8:00 a.m. to 5:00 p.m. While either parenting decision might be respectable, it would not be unreasonable for a jury to conclude that portraying Malika as not having a real childhood because she was required to provide most of the care for her disabled sister harmed Ms. Harp's reputation. Instead of seeing Ms. Harp as a mom who went to great lengths to provide Malika with a normal childhood despite the challenges the family faced, the community sees Ms. Harp as a mom who allowed Malika's childhood to be consumed by care for her disabled sister. A jury could reasonably find that the defendant's portraying Ms. Harp as the latter when in fact she was the former tended to lower her esteem in the community.

The defendants point out that several of the allegedly defamatory statements about Malika's childhood are opinions. For example, Glock's statements that Malika's home life was "really challenging" and caused her "extreme stress and duress" are subjective evaluations of Malika's circumstances rather than purely factual propositions. However, under Wisconsin law, "communications are not made nondefamatory as a matter of law merely because they are phrased as opinions, suspicions or beliefs." *Converters Equip. Corp. v. Condes Corp.*, 80 Wis.2d 257, 263–64 (1977). Moreover, "[w]here the defamer departs from expressing 'pure opinion' and communicates what the courts have described as 'mixed opinion,' . . . liability may result." *Bauer v. Murphy*, 191 Wis. 2d 517, 540 (Ct. App. 1995). "Mixed opinion" is a communication that blends

13

an expression of opinion with a statement of fact. *Id.* "This type of communication is actionable if it implies the assertion of undisclosed defamatory facts as the basis of the opinion." *Id.*

Here, the allegedly defamatory statements that could be viewed as opinions—when understood in the context of the entire episode—are based on the allegedly defamatory factual statement that Ms. Harp allowed Malika to provide most of the care for her disabled sister. The episode identifies no other potential source of Malika's "extreme stress and duress" and no other explanation for why Malika did not feel loved until she met Roz. Thus, the opinion-laden statements are also statements of fact that are capable of defamatory meaning to the extent they implicitly repeat the allegedly false representation that Malika was "largely responsible for" her disabled sister.

The defendants' remaining argument for dismissal of the defamation claim is that Ms. Harp has failed to plead special damages. This argument is based on the distinction between the two forms of defamation, libel and slander. Under Wisconsin law, a pleader of a claim for slander must allege special damages unless the alleged slander counts as slander per se. *See Martin v. Outboard Marine Corp.*, 15 Wis. 2d 452, 461 (1962). However, all libel is actionable without an allegation of special damages. *Id.* at 460–61. In the present case, the defendants assume that Ms. Harp's defamation claim is for slander, and they contend that therefore she must plead and prove special damages or show that this case involves slander per se.

Slander is often described as defamation by spoken words, while libel is described as defamation in writing. *See, e.g., Bauer*, 191 Wis. 2d at 524. However, this

14

is an oversimplification. The Restatement (Second) of Torts § 568 (1977)—which Wisconsin courts follow, *see id.*—provides a fuller explanation of the distinction:

> (1) Libel consists of the publication of defamatory matter by written or printed words, by its embodiment in physical form or by any other form of communication that has the potentially harmful qualities characteristic of written or printed words.
>
> (2) Slander consists of the publication of defamatory matter by spoken words, transitory gestures or by any form of communication other than those stated in Subsection (1).
>
> (3) The area of dissemination, the deliberate and premeditated character of its publication and the persistence of the defamation are factors to be considered in determining whether a publication is a libel rather than a slander.

In the present case, although the allegedly defamatory statements were spoken, they are embodied in a non-transitory, physical form that anyone can view today. (Ms. Glock alleges that the episode is currently available for purchase on Amazon.com for $2.99. Compl. in 18-C-1039 ¶ 4.) Thus, the defamatory matter is embodied in a "form of communication that has the potentially harmful qualities characteristic of written or printed words." Restatement (Second) of Torts § 568. Ms. Harp's claim is therefore properly characterized as one for libel.

It is true that Ms. Harp labels her cause of action "slander." Compls. at p.15. However, under federal law, a plaintiff does not have to plead legal theories or label her cause of action, and "specifying an incorrect legal theory is not fatal." *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992). Here, the facts alleged add up to a claim for libel rather than slander, and therefore I will apply the legal rules that govern claims for libel rather than slander. Because an allegation of special damages is not required in an action for libel, I may not dismiss the complaint based on Ms. Harp's supposed failure to plead them.

15

**B. Intentional Infliction of Emotional Distress**

Ms. Harp alleges that the defendants' defamatory statements give rise to a claim for intentional infliction of emotional distress. Under Wisconsin law, such a claim has four elements: (1) the defendant's conduct was intentioned to cause emotional distress; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct was a cause-in-fact of the plaintiff's emotional distress; and (4) the plaintiff suffered an extreme disabling emotional response to the defendant's conduct. *Rabideau v. City of Racine*, 243 Wis. 2d 486, 501 (2001). The defendants move to dismiss this claim on the ground that the complaint does not allege facts suggesting that their conduct in making the allegedly defamatory statements was extreme and outrageous.

For conduct to be extreme and outrageous, "[t]he average member of the community must regard the defendant's conduct in relation to the plaintiff, as being a complete denial of the plaintiff's dignity as a person." *Alsteen v. Gehl*, 21 Wis.2d 349, 359–60 (1963). The Seventh Circuit has observed that "[t]his is a high standard, and Wisconsin courts have been reluctant to find conduct sufficiently extreme to meet this test." *Kennedy v. Children's Serv. Soc'y of Wis.*, 17 F.3d 980, 986 (7th Cir. 1994).

In the present case, it is clear from viewing the episode that the defendants did not engage in extreme and outrageous conduct. Even if the episode contains defamatory statements, no reasonable member of the community would regard the defendants as having completely disregarded the plaintiff's dignity as a person. Indeed, although I have concluded that some of the defendants' statements are capable of defamatory meaning, this was not any easy conclusion to reach. Because it is not obvious that the statements would even lower the plaintiff's reputation in the community,

making those statements certainly cannot constitute the kind of extreme and outrageous conduct necessary to support a claim for intentional infliction of emotional distress. Accordingly, this claim will be dismissed.

## C. Fraudulent Misrepresentation

Ms. Harp alleges a claim labelled "Fraudulent Misrepresentation (Deceit)" against each defendant based on the allegedly defamatory statements. However, Ms. Harp misunderstands the nature of a claim for fraud or misrepresentation. A plaintiff may not bring such a claim whenever a person makes an allegedly false statement that harms the plaintiff. Instead, a claim for fraud or misrepresentation may be brought only when the plaintiff *believes* the misrepresentation. *See, e.g., Tietsworth v. Harley-Davidson, Inc.*, 270 Wis.2d 146, 157 (2004) ("All misrepresentation claims share the following required elements: 1) the defendant must have made a representation of fact to the plaintiff; 2) the representation of fact must be false; and 3) the plaintiff must have believed and relied on the misrepresentation to his detriment or damage."). In the present case, the plaintiff does not allege that the episode contains false statements that she believed. Nor could she, as she obviously knows what happened in her own life. Accordingly, her claim for fraudulent misrepresentation will be dismissed.

## D. Unjust Enrichment

Finally, Ms. Harp alleges a claim against Allison Glock for unjust enrichment, contending that Ms. Glock is unjustly profiting from the sale of the allegedly defamatory episode on Amazon.com. However, Ms. Harp misunderstands the nature of a claim for unjust enrichment. A defendant is not liable for unjust enrichment whenever he or she profits from something that harms the plaintiff. Instead, a claim for unjust enrichment

may be brought only when the plaintiff confers a benefit on the defendant under circumstances making it inequitable for the defendant to retain the benefit without payment of its value. *See, e.g., Sulzer v. Diedrich*, 258 Wis.2d 684, 692 (Ct. App. 2002). In the present case, Ms. Harp conferred no benefit on Ms. Glock, and therefore her claim for unjust enrichment will be dismissed.

## IV. Conclusion

For the reasons stated, **IT IS ORDERED** that the defendants' motions to dismiss (ECF No. 24 in Case No. 18-C-1039 and ECF No. 16 in Case No. 18-C-1159) are **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that the plaintiff's motion to amend her complaint (ECF No. 38 in the lead case) is **DENIED**.

**FINALLY, IT IS ORDERED** that the plaintiff's motion for summary judgment (ECF No. 31 in Case No. 18-C-1039) is **DENIED**.

Dated at Milwaukee, Wisconsin, this 25th day of April, 2019.

　　　　　　　　　　　　　　　　 s/Lynn Adelman  
　　　　　　　　　　　　　　　　LYNN ADELMAN  
　　　　　　　　　　　　　　　　District Judge